**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

M. RANDY RICE, as Chapter 7 Trustee                                    PLAINTIFF

v.                              Case No. 4:11-CV-00386-KGB

LUKEN COMMUNICATIONS LLC                                    DEFENDANT

**BRIEF IN SUPPORT OF MOTION TO EXCLUDE**
**REPORT AND TESTIMONY OF BRUCE ENGSTROM**

## I.  INTRODUCTION

On December 8, 2011, M. Randy Rice, as Chapter 7 Trustee for Equity Media Holdings

Corp., and the jointly-administered subsidiary debtors, filed his First Amended Adversary

Complaint in the above-captioned matter ("Complaint"). The Trustee's Complaint seeks to avoid

the transfer of Retro Television Network ("RTN") to Luken Communications, alleging constructive

fraud under 11 U.S.C. § 548, and the Uniform Fraudulent Transfer Act (codified at Ark. Code Ann.

§ 4-59-201 *et seq.*)[1]. Recovery is sought under 11 U.S.C. § 550. Section 548(a)(1)(B) of the

Bankruptcy Code addresses the Trustee's power to avoid constructively fraudulent transfers and

obligations, and states that:

> (a)(1)   The trustee may avoid any transfer … of an interest of the debtor in property,
> or any obligation … incurred by the debtor, that was made or incurred on or within 2
> years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily –
> . . .
>> (B)   (i)      received less than a reasonably equivalent value in exchange
>> for such transfer or obligation; and
>>> (ii)   (I)      was insolvent on the date that such transfer was made
>>> or such obligation was incurred, or became insolvent as a
>>> result of such transfer or obligation;
>>> (II)      was engaged in business or a transaction, or was about
>>> to engage in business or a transaction, for which any property
>>> remaining with the debtor was an unreasonably small capital;

---

[1] The Arkansas Fraudulent Transfer Act ("AFTA") appears at Ark. Code Ann. § 4-59-201, *et seq.*, and is considered
"the state law analog of 11 U.S.C. § 548. *In re Eubanks*, 444 B.R. 415, FN. 6 (Bankr. E.D.Ark. 2010).

> (III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV)   made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Trustee Rice disclosed the retention of Mr. Bruce R. Engstrom of North Little Rock, AR, to provide expert testimony in this case. Mr. Engstrom's original report was produced on December 1, 2011. His amended report is dated January 17, 2013, and is attached as Exhibit A to the Motion to Exclude. All references herein to exhibits, unless otherwise indicated, are to those attached to the concurrent motion.

Luken Communications, LLC, employed Mr. Paul French, of the Dallas, Texas firm of Lain, Faulkner & Co., P.C., as its rebuttal expert. The scope of Mr. French's engagement was to determine whether the Engstrom Report was credible, reliable, and not misleading. Mr. French's report, dated February 18, 2013, is attached as Exhibit B.

The deposition of Bruce Engstrom was taken on April 25, 2013, in Little Rock, Arkansas. A transcript of his testimony is attached as Exhibit C.

Based upon the contents of the January 17, 2013 report and attached exhibits ("Engstrom Report"), the deposition testimony of Bruce Engstrom, and the analysis and opinion of its own expert ("French Report"), Luken Communications objects to the report and proposed testimony of Engstrom, for the reasons described more fully below. By contemporaneously-filed motion, Luken Communications seeks an order from this Court excluding the Engstrom Report and the testimony of Engstrom.

## II. ARGUMENTS AND AUTHORITIES

### A.   Admissibility of Expert Testimony Under *Daubert* and the Federal Rules of Evidence

Trustee Rice has the burden to establish, by a preponderance of the evidence, that Bruce Engstrom is qualified, that his testimony is relevant to the issues in the case, and is based upon a reliable foundation. *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579, 592-93 (1993); FRE 104(a). Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training or education may offer opinion testimony if (a) the expert's specialized knowledge will help the trier of fact understand evidence or determine a fact in issue; (b) the opinion is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. FRE 702 was amended in 2000 to reflect the Supreme Court's 1993 decision in *Daubert*, and the numerous subsequent cases in which it was applied.

In *Daubert* the Supreme Court described the "gatekeeping" responsibility of the trial courts to exclude unreliable expert testimony, as to scientific knowledge in particular, employing in their considerations certain relevant, non-exclusive factors: (1) whether the theory or technique can be or has been tested, as opposed to being conclusory; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and whether the technique or theory is generally accepted in the applicable community. 509 U.S. at 593-94. By extension in *Kumho*, the Court made it clear that the *Daubert* analysis was equally applicable to other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 141 (1999).

The purpose of a reliability analysis under *Daubert* is to ensure that the expert uses the same level of intellectual rigor as other experts in the same field. *Kumho*, 526 U.S. at 142. Not every factor set forth in *Daubert* will be relevant in every case, and some that were not set forth may be considered by the trial courts. Factors considered by other courts, and particularly relevant in the present matter include: (1) whether the proposed expert will testify as to matters directly related to

independent research, or to an opinion reached expressly for litigation purposes (*Daubert v. Merrill Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995)); (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (*See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); and (3) whether the proposed expert is being "as careful as he would be in his regular professional work outside his paid litigation consulting." (*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)). An opinion cannot be connected to the facts of a case based purely on the *ipse dixit* of the expert. *Hendrix v. Evenflo Co.*, 609 F.3d 1183,1194 (11th Cir. 2010).

The Amended Report of Bruce Engstrom, and his testimony as to matters contained therein, do not satisfy the evidentiary requirements of FRE 702, as informed by *Daubert* and its progeny. Mr. Engstrom's opinion is not based on sufficient and reliable facts or data, but instead relies upon source data that is incomplete, inaccurate, untimely and irrelevant. Mr. Engstrom's opinion either ignores or misapplies generally-accepted principles of valuation. Mr. Engstrom's report, prepared for litigation purposes only, contains no independent analysis or original information. Instead, Engstrom expresses conclusions predicated on data he failed to verify, prepared by others, and provided to him by his client, thereby demonstrating a failure to exercise the same level of intellectual rigor as other professionals in the same professional community. For these reasons, Mr. Engstrom's report, and his testimony as to same, are wholly inadmissible, and should be excluded.

### B.  The Engstrom Report Reaches Legal Conclusions, Offers No Opinion of Value and Will Generally Not Assist the Trier of Fact

Under Federal Rule of Evidence 704(a), opinion testimony is not rendered inadmissible solely because it embraces an ultimate issue to be decided by the trier of fact. The opinion testimony of an expert, however, must still comply with the strictures of Rule 702, in that it must "assist the trier of fact to understand the evidence or determine a fact in issue. *Fed. R. Evid. 702(a)*; *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005). "Under either rule,

evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible." *Kostelecky v. NL Acme Tool/NL Industries, Inc.*, 837 F.2d 828, 830 (8th Cir. 1988) (citing *Hogan v. American Telephone and Telegraph Co.*, 812 F.2d 409, 411-12 (8th Cir. 1987)). Such evidence is often labeled a "legal conclusion." *Kostelecky*, 837 F.2d at 830. "When expert opinions are little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements." *Perry v. Stevens Transp., Inc.*, 2012 U.S. Dist. LEXIS 94942, 2012 WL 2805026 at *17 (E.D. Ark)(citing *Estes v. Moore*, 993 F.2d 161, 163-64 (8th Cir. 1993)). In sum, "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003). Expert testimony should offer support to the jury's work, not usurp it completely.

To prevail on the §548 claim, Trustee Rice must prove, as alleged in the active Complaint, that the RTN Transfer was made for less than reasonably equivalent value, at a time when the debtor/transferor was insolvent.[2] In order to meet this burden, the Trustee must put forth credible, admissible proof of both the actual value of RTN on June 24, 2008, and the insolvency of the debtor/transferor as of June 24, 2008. Engstrom admittedly performed no valuation, and does not propose to opine on the value of RTN on the date of transfer. Engstrom's supposed insolvency analysis contains no calculations, and offers no opinion as to the precise financial condition of the debtor/transferor on the date of transfer.

According to Section 1 of the Engstrom Report, under the heading "Scope of Assignment," Mr. Engstrom states that:

> EGP, PLLC and Bruce Engstrom were retained by Rochelle McCollough
> [sic] LLP, special litigation counsel for M. Randy Rice, Chapter 7 Trustee, in
> the case of Equity Media Holdings Corporation, et al. vs. Luken

---

[2] As identified above, there are other factors that, along with failure to give "reasonably equivalent value," will render a transfer constructively fraudulent under §548. This analysis is limited to the focus of Engstrom's opinions.

> Communications, LLC and Henry G. Luken, III. We were asked to opine on
> two matters regarding this case: 1) Whether or not the sale of Retro
> Television Network on June 24, 2008 to Luken Communications, LLC from
> Equity Media Holdings was a transaction that met the definition of fair
> market value and 2) whether or not Equity Media was insolvent at the time
> the transaction occurred. Exhibit A, pg. 4.

The matters on which Engstrom was engaged to opine are the legal conclusions that are to

be determined by the factfinder, upon proof by the plaintiff. Engstrom's Report and testimony reach

conclusions that will not assist the jury in making any finding under §548, and are therefore

inadmissible under the standards set forth in *Daubert*, *Kumho*, the Federal Rules of Evidence.  The

scope of Engstrom's engagement specifically did not require him to render an opinion on the issue

that would make his testimony relevant and admissible in this matter - the value of RTN on the date

of transfer.

### i.    Engstrom Offers No Opinion of the Value of RTN on June 24, 2008

In order to determine whether or not the RTN Transfer to Luken Communications was

constructively fraudulent under §548, the jury will require credible, admissible evidence of the

value of RTN on June 24, 2008. Engstrom was not retained to reach an opinion of value, and his

Report does not offer one. His deposition testimony confirms that he "didn't perform a valuation"

(Exhibit C, 24:14), or reach an independent opinion of value:

> Q:    Did you offer an opinion of value in your opinion?
> A:    No. I commented -- well, I did in a way, okay, but it didn't rise to the
>       level of an opinion of value. What I did was look at -- look at what
>       other people had valued this company, and compared their indications
>       of value to what -- the transaction that occurred.
> Q:    Okay.
> A:    And that in itself you could describe as I was describing values, but I
>       did not arrive at an independent, separately valuation of our -- I relied
>       on other people to do that.

Exhibit C, 24:25-25:10.

If Engstrom did not perform a valuation, but instead reviewed valuations performed by

others, then any opinions related to the issue of the value of RTN on the date of transfer are outside

the scope of matters on which he is qualified to offer testimony. If the purported values determined by others are admissible to prove value on the date of transfer, then those reports can be placed into evidence, and their authors called to testify as to their contents. To the extent that these "valuations" performed by "other people" form the entire basis for Engstrom's opinions in this matter, his testimony is not reliable, credible, or likely to assist the jury in any fashion.

### ii. Engstrom's Conclusory Fair Market Value/Reasonably Equivalent Value Analysis Will Not Assist the Trier of Fact Because It Is Superficial and Unsupported

§548 uses the term "reasonably equivalent value" ("REV"), which is not defined in the Bankruptcy Code, but instead depends "on all the facts of each case," considering factors such as the fair market value of what was transferred and received, whether the transaction was at arm's length, and the good faith of the transferee. *In re Gluth Bros. Construction, Inc.*, 424 B.R. 368, 376 (Bankr. N.D.Ill. 2009) (internal citations omitted). Though Engstrom's scope of assignment speaks in terms of "fair market value," ("FMV") Engstrom offers no analysis of FMV that is independent of the concept of REV. Engstrom opines that the RTN Transfer did not meet the definition of FMV, because it was 1) not a transaction at arms' length and 2) was a sale under duress of insolvency. Exhibit A, pg. 10. Both of the stated reasons are elements of the totality of circumstances test often employed by courts performing an REV analysis. *In re Vaso Active Pharms., Inc.*, 2012 Bankr. LEXIS 4741; 2012 WL 4793241 at *56-57 (D.Del.).

That the relevant section of the Engstrom Report is entitled "Fair Market Value and Reasonably Equivalent Value," suggests without more that Engstrom is offering a conclusion as to REV. Engstrom specifically acknowledges the relationship between FMV and REV: "While there is no set formula for determining reasonably equivalent value, the bankruptcy courts tend to look toward the fair market value of the property transferred." Exhibit A, page 9. Further, Engstrom actually states on page 11 of the Report that "Equity Media did not receive 'reasonably equivalent

value' under this transaction." Exhibit A.  In addition to being outside the scope of Engstrom's

engagement, the conclusion as to REV represents an application of a legal standard to the facts of

the transaction. This conclusion is not Engstrom's to make, and should be left to the jury.

However, even if it were proper for Engstrom to reach a conclusion as to whether the RTN

Transfer was for REV, his conclusion is too thinly supported to be admissible under FRE 702.

Engstrom's summary of the RTN Transfer is highly misleading, in that it does not completely

describe the consideration paid by Luken Communications. Engstrom references the cash price of

$18.5 million, and Equity Media's right to repurchase at $27.5 million on or before December 24,

2008. Engstrom fails to state the fact that if the repurchase option was not exercised, and Luken

Communications sold RTN for more than $18.5 million to an unaffiliated third party within 12

months of purchase, Equity Media would be entitled to 50% of the excess sum.  Neither does

Engstrom identify the undisclosed liabilities incurred by Luken Communications, which are

estimated to have exceeded $4 million. It is impossible to reach a credible determination of the

fairness or reasonableness of the value of a transaction if not all of the elements of value are known

and considered.

Engstrom concludes that the RTN Transfer was not a transaction at arms' length, because

"Luken and Equity Media were related parties just prior to the transaction," and because "Luken

was Equity Media's CEO and President a month prior to the sale." Exhibit A, pg. 10. The

relationship between Mr. Henry Luken, a non-party to this matter, and Luken Communications,

LLC, the actual purchaser in the transaction is irrelevant. The disinterestedness of Mr. Luken from

the RTN Transaction has already been addressed by the Court (under Judge Holmes), which found

that he was not an "insider" for purposes of the Trustee's original claim to avoid the RTN Transfer

as preferential under §547 of the Bankruptcy Code. Mr. Luken was dismissed from the case in June

of 2011 on partial judgment on the pleadings.[3] See [Doc. 20, JLH]. Testimony as to this relationship is improper, and likely to be prejudicial and misleading to the jury. Given that this represents half of the basis for his determination that Equity was insolvent on the date of transfer, any testimony on that matter should be excluded.

Next, Engstrom concludes that the sale of RTN to Luken Communications was under duress due to the insolvency of "the seller (Equity Media)." In identifying Equity Media as "the seller," Engstrom raises further concern over whether he sufficiently familiarized himself with the details of the RTN Transfer. It is evident on the face of the stock purchase agreement that the seller in the RTN Transaction was not Equity Media, but rather one of its wholly-owned subsidiaries, C.A.S.H. Services. The Engstrom Report makes no reference to C.A.S.H. Services, or to the sales agreement. No copy of the sales agreement is attached to the Report. For the Court's convenience, a copy of the RTN Transfer agreement is attached as Exhibit G to the Motion.  Engstrom's deposition testimony on the subject did little to clarify the question, and in fact further highlighted how superficially he understood the RTN Transfer:

> Q:   Let's talk about the transaction, you referred to the transaction. Did you review the sales agreement?
> A:   Yes, I did.
> Q:   It's not listed in your documents, I don't believe. I was curious. Let me make sure I'm right there.
>       Yeah, I was right. It's not listed in your data and other information --
> A:   That's correct.
> Q:   -- considered.
> A:   Right.
> Q:   The sales -- the sales agreement was not?
> A:   Not by itself. What I relied upon was the analysis of the sales agreement done by the other valuators, their description of the transaction.

---

[3] Mr. Engstrom was unaware of this fact, as evidenced by his inclusion of Mr. Luken's name in the case-style and headings in the Report, and his own deposition testimony in which he indicated that he had "no idea" whether Henry Luken was still a defendant in the case. Exhibit C, 14:22-25. This type of error is indicative of the imprecision that plagues the Report and badly damages Engstrom's credibility as an expert.

Q:  And that would have been which evaluators [sic]?
A:  Ladenburg, I believe.
          I think it would have been in connection with the Ladenburg.
Q:  The fairness opinion they prepared for Equity Media?
A:  They described it -- they described the transaction in there.
Q:  And is that the only analysis or data you considered regarding the transaction itself?
A:  Well, I mean, I checked them out. I went back from Ladenburg and looked at the sales agreement that we have. Okay. I have it here with me today. And made sure that they were not missing something or there is something else I needed to know, but it looked to me that everything I needed to know was in the Ladenburg.
          …

Q:  Who were the parties to the sales agreement?
A:  Here, let me get it for you.
Q:  Well, let's just ask it this way. Who did Luken buy Retro from?
A:  They bought them from the Equity Group, okay, and the Equity group contained several of their subsidiaries. Ladenburg treated it as Equity.
Q:  Are you familiar with a company called Cash [sic], Inc.?
A:  It's part of the Equity Group.

Exhibit C, 25:11-26:14, 26:17-25.

Following that line of testimony, Engstrom stated that he had not looked in particular at C.A.S.H., but at Equity as a group, and that the involvement of C.A.S.H. "didn't affect what [he] was doing." Exhibit C, 27:21-28:1. In sum, Engstrom proposes to offer expert testimony on the nature and effect of a transaction between parties he cannot properly identify, for consideration he can only half-describe, without reference to or reliance upon the transaction documents.

Further, Engstrom supports his opinion that the RTN Transfer was made under duress by stating that Equity Media was insolvent at the time of transfer. This adds a confusing element of circularity to Engstrom's analysis, as it depends for its accuracy on another of his own unsupported opinions. Perhaps the more critical flaw in the duress-of-insolvency conclusion is that it directly conflicts with the basis for Engstrom's determination that the RTN Transfer was not for REV. Engstrom's REV opinion is based in large part upon significant intangible value ascribed to RTN in appraisals prepared by others, and accepted as reliable by him. To arrive at his opinion of

insolvency on the date of transfer, Engstrom must ignore that same significant intangible value. Engstrom's opinions are conflicting and mutually exclusive, rendering each unreliable, and unlikely to assist the jury.

### iii. Engstrom's Insolvency Analysis Fails to State the Correct Standard for Use Under the Bankruptcy Code and Is Based On Improper Data

Engstrom's insolvency analysis is improper and unlikely to assist the jury in reaching a decision. On page 12 of the Report, under the heading "Insolvency of Equity Media at Time of Transaction," Engstrom loosely states two different standards for insolvency, but fails to identify the sources, their common names, how they are applied, or when they are properly used. Neither appears to be informed by the definition of insolvency that appears in the Bankruptcy Code §101(32)(A), under which insolvency (of an entity other than a partnership and municipality) means: "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a *fair valuation*, exclusive of (i) property transferred, concealed, or removed with intent to hinder delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the state under section 522 of this title." Many courts refer to this type of insolvency as "balance sheet insolvency." *In re Eubanks*, 444 B.R. 415 (Bankr. E.D.Ark. 2010). Balance sheet insolvency is notable in its requirement of a fair value assessment. Property that should be considered in a fair value assessment often does not appear on balance sheets, and values that appear on traditional GAAP-compliant balance sheets do not always meet the definition of "fair value," which requires adjustment based on "going concern value." *Peltz v. Hatten*, 279 B.R. 710, 743 (Bankr. D. Del. 2002).

It does not appear that any of the foregoing was considered by Engstrom in arriving at his conclusion, which appears on page 14:

> It is clear that as of the date of the sale to [sic] RTN to Luken Communications that Equity Media was insolvent. They were undercapitalized and incapable of conducting business. They clearly were not

11

> able to meet their obligations as they came due. The transaction that occurred only further left Equity Media with a capital structure that made it unable to operate, ultimately forcing the company into bankruptcy.

Engstrom's conclusion strikes at a number of the keywords from §548, including some from other subsections of the rule not pertaining specifically to insolvency (under §548(a)(1)(B)(ii)(I)), which analysis he was not retained to perform. Imprecise use of Bankruptcy Code terms of art will be dangerously misleading and confusing to laypersons charged with interpreting the notoriously complex language of the Bankruptcy Code.

Engstrom offers in support of his conclusion that Equity Media was insolvent as of June 24, 2008, limited excerpts from Equity's March 31, 2008 and April 2, 2008 (Amended) 10-K reports. These selected sections, which are apparently taken from 3 of the several hundred attached pages of the 10-Ks, are neither explained, nor synthesized into any sort of analysis, but instead are offered as his only identifiable proof of the financial condition of Equity Media on the date of transfer.[4]  While the 10-Ks might be relevant to an overall fair value analysis, they cannot form the entire basis for determination, as they contain presumably-unadjusted values, and were prepared by the very entity whose solvency is in question. The 10-Ks being the sole basis for Engstrom's conclusion of insolvency, his opinion is questionably reliable under *Daubert/Kumho* and FRE 702.

Engstrom's opinion is not based on the bankruptcy standard for insolvency, is supported by limited content from publicly-available documents that he did not prepare, and will offer no assistance to the jury in this matter. Furthermore, any testimony as to the meaning or effect of content that will be placed before the jury would be akin to a "legal conclusion" of the type typically excluded by the courts in this Circuit.

### C. Engstrom Lacks Relevant Experience, Does Not Follow Relevant Professional Standards, and Relies Upon Unverified Data and Opinions of Others

---

[4] On page 13 of the Report, Engstrom references "[t]he fairness opinion as of June 24, 2008," and offers what is apparently a quote from same. No actual citation is offered, making it difficult to determine whether the statement offered is accurate, or in the correct context.

Even if Mr. Engstrom were permitted to reach the conclusions that he does, he is not qualified to do so. Engstrom's deposition testimony indicates that in his recent experience as an expert witness, he has primarily been engaged to opine on damages calculations, and to value business assets in domestic relations matters. See Exhibit C, 88:22-99:23. Engstrom has never represented or worked for a bankruptcy trustee. Exhibit C, 85:4-86:7. When asked about the origin of source documents he considered, including reports that were prepared for Equity Media's exclusive use, he testified that he believed that they had been acquired by trustee counsel in discovery, and that he "[didn't] think they would have them in their own possession." Exhibit C, 84:12-22. It is evident that Engstrom's engagement in this matter did not compel him to familiarize himself with the relationship between a chapter 7 trustee and a debtor.

Though Engstrom does cite to the language of §548 of the Bankruptcy Code, his reference apparently came from a case citation (*In re Roti*, 271 B.R. 281 (N.D. Ill. 2002)) within an article he did not provide a copy of, or reference in such a fashion that it could be easily obtained.[5] Even the full text of *In re Roti* cites §548 only "in relevant part." 271 B.R. at 293. This seems an unlikely source for someone with the requisite experience in performing valuations in the bankruptcy context, and certainly doesn't meet the standard of a generally-accepted and peer-reviewed source for reliability purposes under FRE 702. Engstrom received what he called "a cite to a … Bankruptcy Code section" from Trustee counsel some time on the day before his deposition. Exhibit C, 42:20-23. Whatever it was that he received, he did not consider it in the preparation of his Report, and it did not inform his opinion.

---

[5] Had Mr. Engstrom procured a complete copy of *In re Roti*, it might have directed him to the correct standard of insolvency to apply in reviewing a transfer under §548. On the very same page of the case cited in Engstrom's footnote, the following appears: "The Bankruptcy Code uses a balance sheet approach to insolvency." *Roti*, 271 at 294.

Mr. Engstrom's deposition testimony indicates that he arrived at his opinion by relying upon data he found in other people's work products, without independent analysis or verification. Surely, in his regular accountancy practice, Mr. Engstrom would not, for example, identify himself as the preparer of tax return that was filled out by the client using best-guess estimates, based on the client's sterling reputation alone. Yet, Engstrom testified repeatedly that he believed the professional reputations of the preparing entities was sufficient to allow him to assume and depend upon the validity of the data in their respective reports.[6] This suggests that Mr. Engstrom does not perform his litigation support obligations with the same care that would be afforded to his general practice for his firm. Furthermore, it indicates that Engstrom is unaware of the true nature of the work he is performing.

For example, on page 11 of the Report, regarding the value of RTN at the time of the transaction, Engstrom identifies "indictors of value" from reports prepared by third parties, namely: Holt Media Group, BIA Financial Network, Thomas Weisel Partners, and Ladenburg Thalmann. Asked specifically about BIA during his deposition, Engstrom explained generally how he justifies reliance upon data and calculations performed by third parties:

> Q:     Okay. Let's --let's talk about that. What independent checks did you run on the calculations contained in the BIA report?
> A:     I checked out their reputations. I looked at their Web pages, their experience. I looked at their -- you know, things of that nature. These companies are very well-known. They're very experienced in the area that they're doing the valuations. I read their reports very carefully to make sure that they were talking about fair market value and that it was pursuant to standards, and then decided that based off of their experience and reputations and that stuff that I could rely upon it.
> Q:     So you simply took the report that was given you by your lawyer -- by the lawyer for the trustee?
> A:     I assume -- I think that's where we got it, but as we got it in the course of this litigation, I took those reports, reviewed

---

[6] Luken Communications, with the support of its rebuttal expert, Mr. Paul French, disputes the substantive reliability of the subject materials. The factual and analytical unreliability of Engstrom's "indicators of value" sources will be discussed separately, *infra*.

them, independently checked out the reputation of these firms,
and then decided I could rely upon them.

Exhibit C, 47:9 - 48:2. Even in the limited fashion that he vetted his sources, Engstrom did so by

looking at the sources' own, presumably self-serving websites. Internet reputation research is not a

generally-accepted methodology or practice, and does not demonstrate the necessary level of

intellectual rigor utilized by other professionals.

In order to rely upon the appraisals prepared by other professionals, Engstrom would

necessarily have reviewed them. Review of appraisals is an actual professional practice, with its

own set of standards. When asked whether there were any professional standards that governed the

preparation of his Report, he identified only the AICPA standards related to consulting, litigation

support, and general ethics. Exhibit C, 107:7-21. In fact, there are generally-accepted standards for

appraisal review, published by the Congressionally-authorized Appraisal Foundation as part of what

are commonly called the Uniform Standards of Professional Appraisal Practice ("USPAP").

According to USPAP Standard 3, review of another professional's appraisal should include an

opinion as to "completeness, adequacy, relevance, appropriateness, and reasonableness of the work

under review, developed in context of the requirements applicable to that work."[7] It is clear that

Engstrom did not perform a professional, reliable, credible review of any appraisal upon which his

opinion is based. He is neither qualified to opine on the quality of the work or the accuracy of the

conclusions contained therein, nor justified in relying upon them.

Mr. Engstrom, though properly credentialed on paper, lacks the relevant practical experience

to analyze the RTN Transfer under §548 of the Bankruptcy Code, and thus to provide any

meaningful testimony in this matter. That Engstrom may have the ability to perform a proper

analysis with better guidance is not enough. His acceptance of values calculated by others, after his

---

[7] The Appraisal Foundation, USPAP 2012-2013 Standards, Standard 3 at U-31:928, as located at www.uspap.org/#/52, last visited 5/8/2013.

failure to perform independent calculations (whether due to inability or failure to appreciate the necessity) indicates that he is insufficiently qualified to render an opinion on the specific matters underlying the Trustee's action against Luken Communications. Engstrom's proposed testimony and Report are insufficiently "expert" in this context to be admissible, and should be excluded by this Court pursuant to FRE 702 and *Daubert*.

### D.   Engstrom Report is Misleading As To Sources Relied Upon or Considered

The function of FRCP 26(a)(2) report and disclosures is to give the opposing side a clear picture of the opinions and proposed testimony of a retained expert, and the means by which any opinion will be supported, including data sources, professional standards/methodologies applied, professional qualifications, and recent expert testimony. Even in the absence of a *Daubert* challenge by an opposing party, an expert's report should be sufficiently accurate and reliable for the court to properly perform its gatekeeping obligations. Section 4 of the Engstrom Report contains inaccuracies and omissions that can only be the result of careless preparation or an intentional effort to prop up an ill-conceived opinion. In either event, the credibility of both Engstrom and his report suffer.

The list of "Data and Other Sources Considered" contains 12 items. There are 24 exhibits attached to the Engstrom Report, as it was produced to Luken Communications' counsel by counsel for the Trustee. The additional 12 attachments represent multiple copies of 5 individual exhibits, not one of which is referenced in the Report. FRCP 26(a)(2)(B)(iii) requires that an expert's report contain "any exhibits that will be used to summarize and support" the opinions that will be the subject of the witness' testimony. The rule does not seem to mean that you should include any documents you might decide are important later. Rather, it seems more prudent that an expert's opinion should be produced only after reviewing all potentially relevant data. To the extent that

Engstrom's testimony and Report are allowed by the Court, any documents not actually cited and clearly relied upon, and any related testimony should be excluded.

Items 1-3 are selected American Institute of Certified Professional Accountants ("AICPA") standards related to general ethical conduct for consulting and litigation support services. The Engstrom Report does not contain a statement that it was prepared using these standards, and same is certainly not evident from the form and substance of the Report itself. Though this is not required under Rule 26, it is a factor to be considered in a reliability analysis under FRE 702 & *Daubert*. The credibility that is gained from adherence to professional standards cannot be achieved merely by attaching copies.

Item 4 purports to be a copy of Federal Rule of Civil Procedure 26 obtained from Westlaw. It is not. It was, like much of the rest of Engstrom's supporting documentation, obtained from a non-authoritative internet site. Though the text of the rule may be accurate, the misidentification of the source further suggests that this Report was not prepared with an eye toward accuracy.

Item 5 identifies a copy of the complaint that was considered by Engstrom. Despite the fact that his report was amended in January of 2013, Engstrom is using the original Adversary Proceeding Complaint filed in the Bankruptcy Court in December of 2010. The reference to Bankruptcy Court was withdrawn on May 5, 2011, and the matter has since that time been in the District Court under the present case number. In the meantime, both the parties and the causes of action have changed. The active complaint in this matter is dated December 8, 2011, and appears as [Doc. 34] on the Docket Sheet.

Item 7 identifies IRS Revenue Ruling 59-60 as having informed Engstrom's opinion on the RTN Transfer. The Report does not identify a particular section of the Ruling, of which there are nine, most with numerous subparts. A more accurate reference would have been "IRS Revenue Ruling 59-60, Sec. 2.02." Instead, one might be mislead to think that Engstrom had considered and

relied upon the entire Ruling. This is significant given the text which appears at Section 3.03, which states in part that "[v]aluation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal." Given that the entire factual basis of the Engstrom Report flies in the face of this statement, it is misleading to reference the entire Ruling. If there is a reason why one part of Ruling 59-60 is more relevant than another, then it was incumbent upon Engstrom to explain why.

Item 11 identifies that a document titled "RTN Preliminary Valuation Analysis-Prepared by Thomas Weisel Partners" as being among the information considered. Engstrom admitted in his deposition that item 11 was neither reviewed nor relied upon. On page 11, the Report references an indicated value from Thomas Weisel Partners ("TWP"), while the footnote cite is to a presentation prepared by Ladenburg Thalmann ("Ladenburg"). Mr. Engstrom's testimony, as found on pages 48-50, 68-70 of Exhibit C, confirms that his only reliance upon TWP's purported opinion of value was by virtue of its identification in the Ladenburg presentation, which appears in a single chart, on a single page. The subject presentation materials, as attached to the Report, are stamped "DRAFT," and could not be verified by Engstrom as having been part of or contemporaneous with any formal fairness opinion Ladenburg prepared. Exhibit C, 78:4-80:19.

While the above-described presentation materials are not separately listed, something called "Fairness Onion [sic] of Landenburg [sic] Thalman [sic]", appears as Item 6.  Though his testimony indicates that he believes that he did, Mr. Engstrom did not rely upon the formal fairness opinion letter of Ladenburg Thalmann at all. What he can demonstrate reliance on is three lone pages of the rough draft of the materials provided during an oral presentation by Ladenburg to a special committee of the Board of Equity Media, given at some point prior to the issuance of the formal opinion.

        Q:     Do you know what the fairness opinion was?

> A:     Yeah, I believe so. It's the material that they relied upon in making that opinion, but I'm not relying on that. I'm just relying on some information that's provided in that presentation.
>
> Q:     And that information -- you said one page, page 45?
>
> A:     Page 45.
>
> Q:     That's the only page you relied upon?
>
> A:     Yes.
>
>                     . . .
>
> Q:     Okay. What is your -- what is your testimony?
>
> A:     Here's my testimony. On page 11 of my report, the information on page 45 of this presentation is referenced and relied upon in my report.
>
> Q:     And that's all you relied upon in that report?
>
> A:     Well --
>
> Q:     That's what your testimony, that's what I'm trying to clarify.
>
> A:     No, no, no, there's some other stuff that I relied upon. I relied upon a paragraph on page 10.
>
>                     …
>
>         And I also rely on page 32 of this proposal in my analysis of the insolvency calculation.
>
> Exhibit C, 80:11-19, 81:9-20, 82:9-10.

By his own testimony (though he clearly did not apprehend it at the time), these presentation materials were offered only in support of the oral presentation, and not of the formal fairness opinion:

> A:     That's part of the opinion. The opinion and analyses were presented to the board at the same time.
>
> Q:     How do you know that?
>
> A:     Because it says it right here. It says, this presentation and its analyses are only for the use by the special committee of the board of directors and are not -- you know, and they go to --
>
> Q:     What's the date?
>
> A:     [Reading from the materials] These materials are being furnished and should be considered *only in connection with the oral presentation being provided by Ladenburg in connection herewith*. So I think I made a very reasonable assumption -- (Emphasis supplied)
>
> Exhibit C, 79:21-80:7.

Even as he says the words himself, Engstrom does not appreciate that his reliance upon these materials was misplaced. These exchanges are representative of the systemic superficiality of Engstrom's preparation and analysis.

Of the twelve items listed as "Data and Other Information Considered," eight are rendered questionable either by the Report, the testimony of Engstrom, or merely by looking at the document. Whether by accident or design, the inaccuracies as to the sources considered by Engstrom render the Report, and his proposed testimony, not credible, not reliable, and misleading, and both should be excluded.

### E.   Engstrom Relies Upon "Indicators of Value" That Are Incomplete, Inaccurate, Untimely and Irrelevant

Notwithstanding the impropriety of Engstrom's reliance on unverified data, which on its own merits exclusion, his Report and testimony must still be excluded. In support of his conclusion that the sale of RTN to Luken Communications did not meet the definition of "fair market value," was not for "reasonably equivalent value," and that the transaction occurred at a time when Equity Media was insolvent, Engstrom cites what he calls "other indicators of value for RTN." Exhibit A, pg. 9. Of the four sources described more particularly below, not one is relevant to the ultimate question of the value of RTN on June 24, 2008. Certain of the sources are unreliable, generally, and in the business valuation context, specifically.

Business valuation is a particularly time-sensitive practice. The AICPA, of which Engstrom is a member, includes in its generally-accepted, peer-reviewed publication *Understanding Business Valuation: A Practical Guide to Valuing Small to Medium Sized Businesses*, by Gary Trugman ("Trugman"),[8] the following passage:

> Appraisals are similar to balance sheets in that they are as of a specific point in time. Both internal and external factors affect the value of a company, and therefore, the valuation date is a critical component of the appraisal process. Changing values are easily illustrated in the public stock market. The constant movement of the price of a share of stock illustrates the potential volatility of the value of the stock. Think about what happened to the stock market on a single day: September 11, 2001. What a difference a day makes!

---

[8] Gary Trugman, Understanding Business Valuation: A Practical Guide to Valuing Small to Medium Sized Businesses, 4th Ed., American Institute of Certified Public Accountants, Inc. (2012).

In addition to the professional standards counseling against relying on aged existing appraisals when performing valuations, there is legal precedent against the practice, as well. "The date for determining whether a transfer was made for a reasonably equivalent value is the date the transfer occurred." *Streetman v. US*, 187 B.R. 287, 291 (W.D.Ark. 1995). Courts determining claims under §548 have excluded not only valuations dated in advance of a transaction, but also dated some 5 months after. *In re Richardson*, 23 BR 434, 444 (D.Utah 1982).

Engstrom's understanding of the timing of a valuation is somewhat different. He stated in his deposition that he *did* consider a valuation of a company's market value that was dated 5 months prior to the transaction relevant on the date of transfer. Exhibit C, 51:14-19.  When pressed, Engstrom explained as follows:

> Well, let me explain something. When you do a valuation, okay, one of the premises of the valuation is that it could be sold for this given a reasonable market time, holding on the market. Okay. And a year to five months hold on the market time is -- is well within that period of marketing something like this. So what they were doing was giving a value of what they think it would see for within that holding period.

> Exhibit C, 52:4-12.

At least in the context of the present matter, Engstrom appears to be alone in his certainty that a valuation does not have a nearly-immediate expiration date. Three of the four indicators of value relied upon by Engstrom were specifically excluded by their respective preparers (in sworn testimony) as not properly used to prove the value of RTN on the date of transfer.[9]  When asked if he was aware of this fact, Engstrom said he had "heard that they are -- that they allege that, and if so, I disagree with that." Exhibit C, 59:5-11. Interestingly, Mr. Engstrom believes that the authors of his "other indicators of value" are sufficiently qualified that he can properly rely on their opinions

---

[9] At the time of drafting, the author of the Holt Media Group Valuation Memorandum had not yet been deposed due to his health. Defendant's counsel believes that his testimony will be that his report cannot be used to show the value of RTN on June 24, 2008, but does not have sworn testimony to that effect.

without verification, but feels they are not sufficiently qualified to determine the proper use and application of their own findings.

### i.   The Holt Media Group Valuation Memorandum is Untimely and Does Not Conform to USPAP Standards

The Holt Media Group Valuation Memorandum referenced on page 11 of Mr. Engstrom's Report is dated October 16, 2006, some 20 months before the RTN Transfer, which occurred on June 24, 2008. Mr. Engstrom does not state in his report that he considered the extraordinary gap in time between the effective date of the Holt Memorandum and the RTN Transfer. In his sworn deposition, Engstrom specifically denied that the age of the report "caused him any concern." Exhibit C, 67:12-24. Neither does the Report state any other basis or justification for reliance on the Holt Memorandum. Having failed to consider the age of the Holt Memorandum, and without any discussion of the impact of same, or of other known or knowable subsequent events, such that the valuation could be considered current as of the date of transfer. Mr. Engstrom's reliance on the Holt Memorandum is grossly misplaced, and improper by the standards under which he is obligated to operate, and the legal standards applicable in this matter.

Even without the critical issue of the age of the Holt Memorandum, Mr. Engstrom's reliance would still be improper based on the appraisal standards under which the Holt Memorandum was prepared, which are identified on page 21 (Exhibit A-12) as the 2006 Universal Standards of Professional Appraisal Practice (USPAP). Review of the USPAP standards indicates that the Holt Memorandum likely fails to comply with significant provisions of Rules 9 and 10, as described in substantial detail on pages 10 and 11 of the French Report. Exhibit B. Flaws in the Holt Memorandum include: failure to clearly state the standard of value relied upon in its preparation; failure to state a basis or identify the methods and procedures followed in arriving at a value conclusion; failure to explain the exclusion of certain accepted approaches; and failure to identify a peer-reviewed, generally-accepted method used in arriving at a value conclusion.

The October 16, 2006 report entitled "Holt Media Group, Valuation Memorandum: Retro Television Network" is not a proper basis for determining the value of the RTN Transfer on June 24, 2008, because it is untimely, and does not comply with the USPAP standards, under which it was supposed to have been prepared. To the extent that Mr. Engstrom relied upon the value determined by Holt in arriving at his ultimate conclusion, his conclusion is unreliable and his report and testimony should be excluded.

      **ii.**    **The BIA Financial Network Fair Market Valuation is Untimely and Contains Conditions That Limit Its Use**

There is a similar issue with the age of the report entitled, "BIA Financial Network Fair Market Valuation of Retro Television Network as of September 1, 2007 and Assessment of its Business Plan" ("BIA Report"), which Mr. Engstrom identified as having been relied upon in arriving at his opinion. The effective date of the BIA Report was September 1, 2007, approximately 10 months before the June 24, 2008 RTN Transfer. For the same reasons identified above, under the AICPA, and the standards applied by courts determining §548 actions, the BIA Report would not be properly relied upon to represent the value of RTN on the date of transfer. As with the Holt Memorandum, Mr. Engstrom does not indicate in his report that he considered the age of the BIA Report problematic, or that he gave consideration to other known or knowable subsequent events, such that the valuation could be validated as current at the time of transfer.

As explained by Mr. French in his report (Exhibit B, 5, 15) the BIA Report uses "hockey stick" EBITDA projections, which render the opinion of value reached by BIA not credible or reliable. Using the middle range of values projected by BIA, the compound annual growth rate ("CAGR") relied upon in the report is 176%. According to French, "[t]he extreme short term growth forecasted by Equity Media in an industry niche where there is little or no 'on point' relevant and reliable historical or empirical data, is a red flag requiring detailed analysis by an experienced, competent and unbiased valuation analyst." Exhibit B, pg.16. Though the BIA Report

contained multiple forecasts, none considered the possibility of minimal or no growth. The Engstrom Report contains no indication that Engstrom found the CAGR used by BIA notable or problematic.

Though apparently ineffective as to Mr. Engstrom, the drafters of the BIA Report identified certain limiting conditions, including that the appraisal contained therein was "valid only for the appraisal date specified [therein] and only for the appraisal purpose specified." (Exhibit A-10, 2-3) By the BIA Report's own stated limitations, it is not a proper representation of the value of RTN on the date of transfer to Luken Communications. In further support of this notion, the sworn testimony of the primary author and signatory of the report, BIA's Dr. Mark Fratrik, is relevant. In his deposition on December 19, 2011, Dr. Fratrik's testimony was as follows:

> Q:    Okay. Would your report be a - properly used or fairly used as a fair
>        value assessment of Retro Television Network as of July 2008?
> A:    No.

(Exhibit D, pg 34:12-14).

Based on AICPA standards and the limiting conditions contained in the BIA Report, as corroborated by the testimony of Dr. Mark Fratrik, the BIA Report cannot be used to determine the value of RTN on the transfer date of June 24, 2008. To the extent that Mr. Engstrom relied upon the value contained in the BIA Report in arriving at his ultimate conclusion, the conclusion is unreliable and his report and testimony should be excluded.

### iii.    The Thomas Weisel Partners Opinion Relied Upon Was Incomplete and Not Properly Used to Determine Value on the Date of Transfer

Deposition testimony described above established that Engstrom did not review or rely upon any documents or reports prepared by Thomas Weisel Partners ("TWP"), but rather relied upon a single reference to a conclusion of value located in some presentation materials prepared by Ladenburg Thalmann. Defendant renews its argument that any reference to or stated reliance upon the conclusions of TWP is impermissible and unsupported. However, to the extent that the Court

believes that the TWP opinions and documents were actually considered in the preparation of the Engstrom report, an analysis of their reliability is relevant.

In Section 4 of the Engstrom Report, under the heading "Data and Other Information Considered," Engstrom lists a document titled "RTN Preliminary Valuation Analysis Prepared by Thomas Weisel Partners" ("Weisel Report"). Exhibit A-11. As is often the case with draft or preliminary reports, the Weisel Report was not finalized, signed, or otherwise endorsed by a representative of the firm. The Weisel Report also does not state an effective date, rendering any determination as to the relevancy of its conclusions somewhat speculative.

If the Court should determine that the additional Weisel documents attached to the Engstrom Report, even if not cited or identified as considered, are relevant to the determination of the admissibility of Mr. Engstrom's report and testimony, none will support Engstrom's conclusion. A dated valuation analysis appears in a document titled "RTN Discussion Materials May 2008," (Exhibit A 17/23) however this document is also without signature or other final endorsement. Even a signed or otherwise endorsed version of the May 2008 materials would be ineffective to state the value of RTN on the date of transfer, as testified to by Mr. Gordon Hodge, who served as a director at TWP during the period of time relevant to the RTN Transfer, and assisted in the preparation of related materials. In his sworn deposition on December 5, 2012, Mr. Hodge described the nature of the report they prepared, and the limitations on its use:

> A:      May 2008. It looks like this is where we made an effort to value.
> Q:      RTN —
> A:      This was not a formal valuation. This was our exercise in attempting to value the company as an advisor to Equity Media. We were — it was really taking their — it looks like we took their projections to give them some ranges, some idea as to what — *if they hit their plan* what the company might be worth.  (Emphasis supplied)
> Q:      What page number of this would be the most —
> A:      So this is the May 2008, so these — so this range — this valuation overview is page 6.
> …

Q:      We need easy. Can you walk me through that page and tell me what you found in the way of valuations?

A:      So, it looks as though — so it looks as though we used three different valuation methods. One was a public company, a comparable public company analysis, and one was a precedent transaction analysis. And what that means is just looking at prior change-of-control transactions in the cable network business. And then the last was a discounted cash flow analysis, and then it looked like we may have relied upon, or we were referencing at least, BIA's valuation. B-I-A, I don't know what it stands for. They're a separate company.

Q:      So you would have used their analysis for the —

A:      I think we were laying this — really what we're doing here is laying out for the education of the board various metrics that one might use to value RTN, which obviously was…

Q:      Do you understand the definition of "fair value" as used —

A:      If it's a technical term I'd —

Q:      As used in the bankruptcy code?

A:      Okay, yeah. If you could define that for me.

Q:      Do you understand fair market value?

A:      I believe so. I think I do, but maybe if there's some technical definition…

Q:      Fair value. Roughly equivalent value for the asset. That's what the court is going to look at. Are you roughly giving what you're getting?

A:      Yes.

Q:      Is anything in this report, can it be used to establish fair value of RTN on any given date?

A:      No. I would not use this as a determination of fair market value.

Q:      And Mr. Fratrik, Dr. Fratrik, from BIA, has testified that nothing in his report could be used. His report could not be used to establish value. Is there any other report you looked at that you, in your memory, would have — would be relied upon to establish fair value of RTN on any given date?

A:      I don't recall any. I don't recall any.

Exhibit E, 27:20-30:5.

Mr. Hodge's testimony not only indicates that the May 2008 materials attached to Mr. Engstrom's report would not properly be used to demonstrate the value of RTN on the date of transfer, but also indicates that at least some portion of Thomas Weisel Partners' analysis was based on data found in the untimely and questionably-relevant report prepared by BIA, and discussed *supra*. Given that TWP relied on data contained in the BIA Report, it is no surprise that their range of values is calculated using an inexplicably favorable CAGR of 207%. This is significant and objectionable for the same reasons stated as to BIA, above.

To the extent that Mr. Engstrom relied upon a value or any other information in the Weisel Report or the attached but unreferenced Weisel documents in reaching his ultimate conclusion, his conclusion is unreliable and his report and testimony should be excluded.

### iv.    Ladenburg Thalmann Fairness Opinion Cannot Be Used to Determine Value

As discussed in a previous section, there is some question as to whether or not Mr. Engstrom actually reviewed the formal fairness opinion prepared by Ladenburg Thalmann ("Ladenburg Opinion") at the request of the debtor, prior to the RTN Transfer. To the extent that Engstrom did consider the actual fairness opinion, he cannot properly rely upon it to support a determination of value.

Fairness opinions, by definition, do not involve a determination of value. As described on page 13 of the French Report, per a generally-accepted professional text, within the business valuation context, the purpose of a fairness opinion is to provide essential information about a transaction, as a measure of proof that decision makers used reasonable business judgment. Exhibit B.  The Ladenburg Opinion is no exception, and contains the following relevant language: "Ladenburg does not express any opinion as to the underlying valuation or future performance of the Company or its subsidiaries/businesses, the price at which the Company's securities might trade at any time in the future, or the price that the Company might sell itself or its subsidiaries/businesses in the future." Exhibit B-23, pg 5.  Because fairness opinions are not designed to offer a valuation, they can make the kind of "best-case-scenario" assumptions that Ladenburg made, such as by their use of a CAGR of 485%. Even without a deep familiarity with business valuations, EBITDA projections, or business finance in general, that number is so obviously fantastic that it should have given pause to Engstrom, and caused him to question his reliance on the values he believed were being offered by Ladenburg.

In addition to the foregoing, use of the Ladenburg Opinion to indicate value is further limited by the deposition testimony of Mr. Scott Salpeter, who was employed by Ladenburg Thalmann at the time the Opinion was prepared, and participated in its preparation.

> Q:   Now, when you're talking about the indicated value, you're saying from Weisel, for instance, from BIA, it's not your position that that was the fair value of the assets or the company, is it?
>
> A:   There was never any position in any work that Ladenburg did that I recollect that talked about fair value. In fact, I would believe our opinion letter would specifically identify that this was not a valuation fair value solvency and everything. It very limits it to being a fairness opinion on the consideration to be received.

> Exhibit F, 19:17-20:2

There is no reasonable basis for relying upon the Ladenburg Opinion as an indicator of the value of RTN on June 24, 2008. To the extent that the Engstrom Report and his proposed testimony do so, they are unreliable, and should be excluded.

III.    CONCLUSION

The Amended Report of Bruce R. Engstrom, and his testimony on the matters contained therein, do not meet the standard for admissible expert testimony under the Federal Rules of Evidence and the United States Supreme Court decisions in *Daubert* and *Kumho*. The Engstrom Report fails to meet the professional standards he is obligated to follow pursuant to his AICPA Accreditation in Business Valuation, his National Association of Certified Valuation Analysts' Certified Valuation Analyst certification, and the general professional standards imposed by the Arkansas State Board of Public Accountancy. Insufficiencies and inaccuracies as to form and content render the Engstrom Report not credible, not reliable, misleading, and not likely to assist the jury in reaching a verdict. Based on the foregoing, Luken Communications' Motion to Exclude the Report and Testimony of Bruce R. Engstrom should be granted.

Respectfully submitted,
*Luken Communications, LLC*

By:     /s/ James E. Smith, Jr.
James E. Smith, Jr. (77128)
Allison R. Gladden (2008205)
SMITH AKINS & GLADEN, P.A.
400 W. Capitol Ave, Ste 1700
Little Rock, AR  72201
Ph      501-537-5111
Fax     501-537-5113
jsmith@smithakins.com
ajrantisi@smithakins.com

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on this 9th day of May, 2013, a true and correct copy of the foregoing has been electronically served all parties requesting notice by means of filing same via CM/ECF:

Gregory H. Bevel
Scott M. DeWolf
Kerry Ann Miller
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, TX 75201
*Counsel for M. Randy Rice, Chapter 7 Trustee*

By:     /s/ James E. Smith, Jr.
James E. Smith, Jr.